

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

## NO. 02-11-00267-CR

DENNIS WAYNE BLANCHARD                                                    APPELLANT

V.

THE STATE OF TEXAS                                                                STATE

----------

## FROM CRIMINAL DISTRICT COURT NO. 3 OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1]

----------

## I. Introduction

A jury convicted Appellant Dennis Wayne Blanchard of intoxication manslaughter. In five issues, Appellant asserts that the trial court erred by allowing a State's expert to testify to certain opinions that were "beyond his area of expertise" and by admitting State's Exhibit 75C. We affirm.

---

[1]*See* Tex. R. App. P. 47.4.

## II. Procedural and Factual Background

At Appellant's jury trial, Thomas Roberts testified that he was a fifty-seven-year-old Vietnam veteran. He and Appellant lived in Briar, Texas, in April 2009 and were acquaintances. At approximately 8:00 a.m. on April 21, 2009, Roberts went to Appellant's parents' house to ask Appellant for a ride to collect some money owed to Roberts for yard work. When Roberts arrived, Appellant was cooking breakfast and drinking a beer. While there, Roberts and Appellant smoked marijuana, and Appellant agreed to give Roberts a ride.

Eventually, Appellant and Roberts left in a Lincoln Town Car that belonged to Appellant's mother. At first, Appellant drove the speed limit and had no trouble controlling the car. After unsuccessful attempts to collect money, Appellant and Roberts went to a liquor store, and Appellant bought Roberts a half-gallon bottle of eighty-proof Kentucky Deluxe Whiskey. In the car, Appellant opened the bottle, and he and Roberts both drank "a couple [of] good slugs" from the bottle.

Appellant and Roberts went to Appellant's house for a short time before heading out again. Appellant filled a small drinking glass with whiskey, but Roberts did not see Appellant drink from it at that time. In the car, Appellant and Roberts smoked Appellant's marijuana, and Appellant began driving at speeds of "70 or better." When Roberts threatened to jump out of the car, Appellant slowed down. Appellant and Roberts then picked up Roberts's girlfriend, Jeri, and drove them to Roberts's house. On the way, Appellant drove "[l]ike an idiot," and he "gunned it," reaching speeds of eighty-five miles per hour on thirty-mile-an-hour

2

roads. When Appellant dropped off Roberts and Jeri around noon, Roberts kept the bottle of whiskey, which was about one-third empty. That was the last time Roberts saw Appellant that day.

Steve Barto testified that in April 2009, he lived on Briar Road in Azle. During the afternoon of April 21, 2009, he was in his front yard when he heard what sounded like a car going at least one hundred miles per hour. When he looked up, he saw a Lincoln Town Car "excessively going past" him and headed east toward a "serious S curve" in the road. Seconds later, he heard a loud boom. Barto ran in the direction of the car and saw it wrapped around a utility pole. He called 911. He saw two people pinned inside the car.

Firefighter and paramedic Paul Bales testified that he and others were dispatched to the accident around 2:20 p.m. When he arrived he saw a "horrendously damaged" vehicle wrapped around a telephone pole. Bales went to the driver's side of the vehicle, and his partner, paramedic John Reed, went to the passenger's side. Bales found the driver, later identified as Appellant, not breathing, unconscious, and not wearing a seatbelt. Bales opened Appellant's airway, and Appellant began breathing but remained unconscious. Bales and others eventually removed Appellant from the vehicle, and he was transported by helicopter to John Peter Smith hospital (JPS). Bales did not have contact with the deceased female passenger, later identified as Denise Montague.[2] When

---

[2]Dr. Lloyd White testified that he performed forty-seven-year-old Montague's autopsy. Dr. White determined the cause of Montague's death to be

3

Appellant arrived at JPS, he tested positive for cannabinoids, also known as marijuana. He had a blood-alcohol concentration of .20, two and one-half times the legal limit of .08.

James McDonald testified that he was a sergeant and an accident investigator with the Tarrant County Sheriff's Office. Sergeant McDonald was the primary investigator for the instant offense, and he was assisted by others, including Deputy Melton Kuser and Tim Lovett. Investigators determined that Appellant's car had traveled eastbound at seventy-five miles per hour and crossed the westbound lane before going onto the north shoulder of the roadway, striking a metal mailbox pole, spinning back across the roadway, and striking a utility pole on the passenger side of the car at a speed of sixty-nine miles per hour. Sergeant McDonald testified that posted signs on Briar Road in the direction Appellant had been traveling warned of the S-curve ahead and reduced the speed limit from thirty-five miles per hour to thirty miles per hour. There was no evidence that Appellant ever applied the brakes. The investigators and reconstruction experts ruled out any malformation of the road or car malfunction as explanations for the accident.

The jury found Appellant guilty of intoxication manslaughter, and following the punishment phase, the jury found the State's deadly weapon allegation to be

---

"cranial-cervical dislocation -- in other words, [a] broken neck, essentially, . . . due to a motor vehicle fixed object collision."

true and assessed punishment at twenty years in prison. The trial court sentenced Appellant accordingly.

### III. Admission of Evidence

In his fifth issue, Appellant asserts that the trial court erred by admitting State's Exhibit 75C—a bag containing a green leafy substance found in Appellant's pocket at the hospital—as marijuana without evidence that it was, in fact, marijuana. In support, Appellant relies on rule of evidence 901, which provides in pertinent part that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Tex. R. Evid. 901. Rule 901(b) provides various examples of authentication or identification conforming with the rule's requirements, including the testimony of a witness with knowledge that a matter is what it is claimed to be. Tex. R. Evid. 901(b)(1); *Manuel v. State*, 357 S.W.3d 66, 74–75 (Tex. App.—Tyler 2011, pet. ref'd).

We review a trial court's evidentiary rulings using an abuse of discretion standard. *Tienda v. State*, 358 S.W.3d 633, 638 (Tex. Crim. App. 2012). As long as the trial court's ruling is "within the zone of reasonable disagreement," we will not disturb the ruling. *Id.* (quoting *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1991) (op. on reh'g)).

## A.  Relevant Facts

Registered nurse Kellie Bunch testified that Appellant arrived as a trauma patient at the emergency department of JPS on April 21, 2009.  She testified that a baggie of "what appear[ed] to be marijuana" was found in one of Appellant's pockets during his initial intake.  Bunch turned over the baggie to Officer Jay Taylor with the Tarrant County Hospital District Police Department.  Bunch testified that as a nurse in the emergency department, she had had a few occasions to come in contact with marijuana on patients and was familiar with the smell, appearance, and texture of marijuana.  When the prosecutor asked Bunch whether "what [she] handed over to Officer Taylor [was] in fact marijuana," the trial court sustained Appellant's objection that the prosecutor had not established that Bunch was qualified to testify to what she had found.

Officer Taylor testified that after he was dispatched to JPS on April 21, 2009, Bunch handed him a "clear bag with a green leafy substance in it."  In Officer Taylor's prior experience as a police officer, he had come across marijuana on many occasions.  He testified that he had received police academy training on, and was familiar with, marijuana's appearance, smell, and texture. When the prosecutor asked the officer whether the substance Bunch handed him was marijuana, the trial court sustained Appellant's objection that Officer Taylor was not qualified to offer that testimony.  When the prosecutor asked Officer Taylor whether he "suspect[ed] [the substance] to be something else other than marijuana," the officer responded without objection, "No, sir."

6

Officer Taylor testified that State's Exhibit 75A was an evidence bag that contained the items Bunch had given him at the hospital: two photocopies of Appellant's driver's license (State's Exhibit 75B) and a Ziploc bag containing a green leafy substance (State's Exhibit 75C). Officer Taylor testified without objection that the photocopies of the driver's license were given to him "at the [same] time that [the] marijuana was also given to [him]." Officer Taylor testified that he did not open State's Exhibit 75A but placed State's Exhibit 75C inside State's Exhibit 75A, which he then placed in the property room, and it was eventually turned over to the Tarrant County Sheriff's Office.

Tarrant County Sheriff's Deputy C. Dearing testified that he went to the police station at JPS on April 22, 2009, and that a sergeant gave him a plastic bag that contained a resealable plastic bag and two pieces of paper. Deputy Dearing took the bag intact to the south patrol office, typed his report, completed a property card, and submitted the items into an evidence locker in the sheriff's department property room. He testified that State's Exhibit 75 was the sheriff department's property bag containing the evidence he had received from the hospital district police, which was the same evidence marked as State's Exhibits 75A, 75B, and 75C. Deputy Dearing testified that the only time the evidence was removed from the evidence locker was "[f]or medical examiner testing of the substance, the marijuana substance." He testified that he obtained Exhibit 75 from the evidence locker and brought it to court.

7

When the State offered State's Exhibits 75, 75A, 75B, and 75C into evidence, Appellant objected that "[i]t's not admissible without scientific predicate or it's not relevant without scientific predicate." The trial court overruled the objection and admitted the exhibits into evidence. The State published the exhibits to the jury, stating that "State's Exhibit 75B [was] a driver's license" of Appellant's and that "State's Exhibit 75C [was] a green leafy substance inside of a small sandwich baggie."

## B. Analysis

Appellant cites no authority for his argument that State's Exhibit 75C was inadmissible under rule of evidence 901(b)(1) because there was no evidence that the green leafy substance in Appellant's pocket was actually marijuana. The case Appellant relies on is one in which the appellant challenged the sufficiency of the evidence to support his conviction for marijuana possession, and in which the appellant asserted that the evidence was legally insufficient to establish that the substance he possessed was "in fact marijuana." *See Tarrant v. State*, 1998 WL 423484, at *1 (Tex. App.—Dallas July 29, 1998, no pet.) (not designated for publication). In *Tarrant*, the court of appeals held that

> [a]n experienced police officer may be qualified to testify that a substance is marijuana. Rutledge, a police officer of four years, testified that an officer's training includes learning to recognize the smells, textures, and appearances of different narcotics and drugs. . . . Rutledge also testified that he has "had the opportunity to deal with the substance marijuana and later [had] it confirmed through testing to be marijuana." Rutledge examined the substance in this case and determined that it was marijuana. Rutledge's

8

testimony is sufficient to prove beyond a reasonable doubt that the substance was marijuana.

*Id.* at *3 (citations omitted). Relying on *Tarrant*, Appellant asserts, "In contrast, Deputy Jamie Glenn Taylor testified that his identification of substances as marijuana had never been confirmed by chemical or forensic test."

Appellant's argument is not persuasive. The State did not charge Appellant with marijuana possession and therefore did not have to prove beyond a reasonable doubt that Appellant possessed marijuana as an element of the offense, and Bunch, Officer Taylor, and Deputy Dearing each referred without objection to the green leafy substance in State's Exhibit 75C as marijuana or what appeared to be marijuana. We also note that Appellant's complaint on appeal that the green leafy substance was not authenticated under rule of evidence 901(b)(1) is not the same as his objection at trial that State's Exhibit 75C was "not admissible without scientific predicate or it's not relevant without scientific predicate."[3] *See Lovill v. State*, 319 S.W.3d 687, 691–92 (Tex. Crim. App. 2009) ("A complaint will not be preserved if the legal basis of the complaint raised on appeal varies from the complaint made at trial.").

Even considering Appellant's rule 901(b)(1) appellate complaint, the combined effect of rule 901(a) and (b)(1) permits authentication of evidence by testimony of a witness "that the matter in question is what its proponent claims." Tex. R. Evid. 901(a), (b)(1); *see also Garner v. State*, 939 S.W.2d 802, 805 (Tex.

---

[3]Appellant did not assert a rule 901 objection at trial.

9

App.—Fort Worth 1997, pet. ref'd) ("Rule 901 does not require the State to *prove* anything."). The proponent must only produce sufficient evidence that a reasonable fact finder could properly find genuineness. *Manuel*, 357 S.W.3d at 74. The State introduced State's Exhibit 75C as the baggie found in Appellant's pant pocket containing a green leafy substance that appeared to be marijuana. The State authenticated the exhibit by proving through the testimonies of Bunch, Officer Taylor, and Deputy Dearing that it was what it purported it to be; that is, that it was the baggie found in Appellant's pant pocket containing a green leafy substance that appeared to be marijuana. For all of these reasons, Appellant has not shown that the trial court abused its discretion by admitting State's Exhibit 75C into evidence, and we overrule Appellant's fifth issue.

## IV. Expert Testimony

In his first four issues, Appellant asserts that the trial court erred by allowing the State's collision reconstruction expert Tim Lovett to express opinions allegedly beyond his area of expertise, specifically (1) whether Appellant "consciously disregarded a substantial and unjustifiable risk," (2) whether Appellant's intoxication caused Montague's death, (3) whether Appellant's operation of his vehicle was a "gross deviation" from a normal standard of care, and (4) whether Appellant used his vehicle as a deadly weapon.

## A. Applicable Law and Standard of Review

Rule of evidence 702 allows a witness qualified by knowledge, skill, experience, training, or education to testify on scientific, technical, or other

10

specialized subjects if the testimony would assist the trier of fact in understanding or determining a fact issue. *See* Tex. R. Evid. 702. Three separate inquiries must be met before a trial court admits expert testimony: (1) the witness qualifies as an expert by reason of his knowledge, skill, experience, training, or education; (2) the subject matter of the testimony is an appropriate one for expert testimony; and (3) admitting the expert testimony will actually assist the factfinder in deciding the case. *Davis v. State*, 329 S.W.3d 798, 813 (Tex. Crim. App. 2010), *cert. denied*, 132 S. Ct. 128 (2011). These conditions are commonly referred to as (1) qualification, (2) reliability, and (3) relevance. *Id.* (citing *Vela v. State*, 209 S.W.3d 128, 131 (Tex. Crim. App. 2006)). These three requirements raise distinct questions and issues, and an objection based on one requirement does not preserve error as to another. *Shaw v. State*, 329 S.W.3d 645, 655 (Tex. App.—Houston [14th Dist.] 2010, pet. ref'd). Only the first condition is at issue in this case.[4]

The court of criminal appeals has held:

> Qualification is a two-step inquiry. A witness must first have a sufficient background in a particular field, and a trial judge must then determine whether that background goes to the matter on which the witness is to give an opinion. The proponent must establish that the expert has knowledge, skill, experience, training, or education regarding the specific issue before the court that would qualify the expert to give an opinion on that particular subject.

---

[4]In his brief, Appellant states, "[W]e are concerned only with qualification."

11

*Davis*, 329 S.W.3d at 813 (citations omitted); *see Vela*, 209 S.W.3d at 131–32. The focus is on the fit between the subject matter at issue and the expert's familiarity with it, and not on a comparison of the expert's title or specialty with that of the defendant or competing expert. *Vela*, 209 S.W.3d at 133. "Just as the subject matter of an expert's testimony should be tailored to the facts of a case, the expert's background must be tailored to the specific area of expertise in which the expert desires to testify." *Id.*

"Because the spectrum of education, skill, and training is so wide, a trial court has great discretion in determining whether a witness possesses appropriate qualifications as an expert on a specific topic in a particular case." *Davis*, 329 S.W.3d at 813 (citing *Vela*, 209 S.W.3d at 136). "[W]hen a trial judge determines that a witness is or is not qualified to testify as an expert, 'appellate courts rarely disturb the trial court's determination.'" *Vela*, 209 S.W.3d at 136 (quoting *Rodgers v. State*, 205 S.W.3d 525, 528 n.9 (Tex. Crim. App. 2006)).

**B.  Relevant Facts**

Tim Lovett testified that he is an employee of Crash Dynamics, a consulting and training firm in the area of collision reconstruction, and a retired Hurst police officer.  Regarding his qualification as an expert, Lovett testified that he began his law enforcement career in 1975, graduated from the police academy in 1982, and retired from the Hurst police department after twenty-three years.  As a police officer, Lovett received training from the National Academy for Professional Driving about how to drive at high speeds and how to control

12

vehicles in pursuit and in day-to-day driving. This included training on avoidance maneuvers and how to present a vehicle when faced with an inevitable collision. For several years, Lovett was part of a selective traffic-enforcement program aimed at hazardous violations and DWIs, and he was an intoxilyzer operator. During his career, he had worked about 500 intoxication manslaughter cases. Lovett testified that, as a Hurst police officer, he conducted collision investigations, also referred to as accident reconstructions. He responded to between 4,000 and 5,000 wrecks and did several hundred reconstructions. He did not know how many reconstructions he had done since leaving the Hurst police department. When the State asked Lovett what training qualified him to testify as an expert in district court, Appellant stated, "Your Honor, we will stipulate that he's an expert and he's qualified to testify."

When asked whether the S-curve on Briar Road was particularly difficult for an average, experienced, and sober driver to navigate when driven at the posted thirty-mile-per-hour speed limit, Lovett replied, "No, sir." When the State asked whether the S-curve on Briar Road was "one that a person operating a motor vehicle close to 75 miles per hour would be able to navigate safely," Lovett replied, "No, sir." When the State asked Lovett whether he would characterize driving down that stretch of roadway and coming up on that S-curve at seventy-five miles per hour as "a dangerous thing to do," Lovett responded, "Yes, sir, extremely."

13

When the State asked Lovett questions about whether Appellant had acted recklessly, whether his vehicle was a deadly weapon, and whether intoxication had a role in the collision, the trial court sustained Appellant's objections. When the State again asked Lovett whether, based on all of the documents he had reviewed in the case, as well as his training, experience, and knowledge about intoxication, he would say that intoxication had a role in this collision, the trial court sustained Appellant's objection.

The next day during the State's redirect examination of Lovett, the prosecutor asked additional questions regarding his qualifications. Lovett testified that he had previously testified on many occasions in Tarrant County district courts as an expert in accident reconstruction and on many occasions in the district courts of other counties in Texas, in courts of other states, and in federal court. He further stated that he had testified on many previous occasions in Tarrant County district courts about his opinion of the causation of a collision, whether a vehicle was used as a deadly weapon, and whether the vehicle was being driven in a reckless manner. Lovett testified that he had had specific training in detecting signs of intoxication and intoxication behavior in humans who have been driving. Lovett then testified to the following:

> Q. [State]: Mr. Lovett, do you have an opinion as to the causation of the collision in this case?
>
> A. Yes, sir.
>
> Q. Now, in your opinion, at that speed, 75 miles per hour that you previously testified about, on that stretch of roadway, would a

14

person operating a motor vehicle be consciously disregarding a substantial and unjustifiable risk of losing control and thereafter causing the death of himself and another?

[Defense Counsel]: I object, Your Honor. Ask -- ask the witness to speculate about the mental state of another person. And he hasn't been qualified [to] do that.

THE COURT: Overruled.

A. [Lovett]: Absolutely.

Q. [State]: In your opinion, Mr. Lovett, at that speed on that stretch of roadway, would a person operating a motor vehicle in that regard be engaging in a gross deviation from the standard of care that an ordinary person would exercise?

[Defense Counsel]: Objection, again, Your Honor. Witness hasn't -- witness hasn't been qualified to answer this question.

THE COURT: Overruled.

A. [Lovett]: Yes. It's a gross deviation from what's normal.

. . . .

Q. [State]: In your opinion, Mr. Lovett, do you have any reason to suspect, based on your review of the evidence and your expertise and knowledge, that this collision was due to any external factors, such as the roadway or otherwise, not having to do with the conduct of the Defendant?

A. There's no evidence that anything outside the vehicle itself and the speed it was driving, and there's no external factors, no.

. . . .

Q. [State]: Mr. Lovett, what is your opinion, your professional opinion as to the causation of the death of Denise Montague?

15

[Defense Counsel]: Objection, Your Honor. I -- I object the witness is not -- is not the medical examiner. The -- the cause of death has already -- there's -- there's already been testimony as to cause of death. And the witness is not -- is not an expert for this -- for this issue. And I -- I'm not sure on Thursday afternoon we want to re-litigate the case through Mr. Lovett.

THE COURT: Overruled.

A. [Lovett]: Yes, I do have an opinion. What we see in these driving facts is consistent with what we see from intoxicated driving, and that coupled with the speed is the causation of her death.

Q. [State]: . . . In your opinion, is the manner in which the vehicle was being driven on the -- at the time and day of the collision such that it was being driven or being used as a deadly weapon?

[Defense Counsel]: I object. I object again, Your Honor. Calls for legal conclusion. Witness hasn't been qualified.

THE COURT: Overruled.

A. [Lovett]: Without a doubt.

Q. [State]: Was it capable of causing death or serious bodily injury?

A. Yes, sir.

Q. And, in fact, it did cause death in this case?

[Defense Counsel]: Continuing objection, Your Honor.

A. [Lovett]: Yes.

THE COURT: I'll grant your -- I'll allow you to have a continuing objection to that. Overruled.

[State]: Your Honor, I'll pass the witness.

16

## C. Analysis

We begin by recalling that Appellant stipulated that Lovett is a qualified expert witness. Appellant's counsel stated on the record during Lovett's testimony that "we will stipulate that he's an expert and he's qualified to testify." We also observe that although an expert "may not testify to his opinion on a pure question of law," it is permissible for an expert to "state an opinion on a mixed question of law and fact as long as the opinion is confined to the relevant issues and is based on proper legal concepts."[5] *Anderson v. State*, 193 S.W.3d 34, 38 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd). "[A] mixed question of law and fact [is] one in which a standard or measure has been fixed by law and the question is whether the person or conduct measures up to that standard." *Blumenstetter v. State*, 135 S.W.3d 234, 248 (Tex. App.—Texarkana 2004, no pet.). For example, whether the factual circumstances surrounding an accused's drinking meet the legal standard of intoxication is a mixed question of law and fact, as is the question of whether a certain object could be used as a deadly weapon. *Id.*; *see Anderson*, 193 S.W.3d at 38.

The State asked Lovett for his opinion as to whether Appellant "consciously disregard[ed] a substantial and unjustifiable risk," whether Appellant's operation of his vehicle was a "gross deviation" from a normal standard of care, whether Appellant used his vehicle as a deadly weapon, and

---

[5]Appellant does not contend that Lovett's testimony was not relevant or based on proper legal concepts.

whether Appellant's intoxication caused Montague's death. Other than whether Appellant's intoxication caused Montague's death, the questions asked Lovett for his opinions on mixed questions of law and fact because they asked him to opine whether the facts and circumstances revealed by his investigation measured up to a standard of legal culpability. *See Anderson*, 193 S.W.3d at 38; *Blumenstetter*, 135 S.W.3d at 248. The questions were proper because they did not ask Lovett to give his opinion on a pure question of law such as whether Appellant's conduct constituted intoxication manslaughter. *Compare Anderson*, 193 S.W.3d at 38 (noting that whether an object could be used as a deadly weapon is a mixed question of law and fact), *with Jones v. State*, No. 05-08-00925-CR, 2009 WL 3366559, at *3–4 (Tex. App.—Dallas Oct. 21, 2009, pet. ref'd) (not designated for publication) (holding that whether acts constituted capital murder was improper question for expert because it was a pure question of law that "decided the issue of guilt for the jury"), *cert. denied*, 131 S. Ct. 296 (2010). Instead, the questions asked Lovett to apply his investigation and knowledge of the facts to legal standards. As to whether Appellant's intoxication caused Montague's death, rules of evidence 702 and 703 permit a qualified expert witness to express opinions based on the facts or data "perceived by, reviewed by, or made known to the expert at or before the hearing." Tex. R. Evid. 702, 703; *see Vasquez v. State*, No. 02-04-00214-CR, 2006 WL 133462, at *3 (Tex. App.—Fort Worth Jan. 19, 2006, no pet.) (mem. op., not designated for publication) (noting that Vasquez had stipulated to expert's qualifications and

18

holding that expert could express opinions on the cause of the victim's injuries based on expert's "knowledge, experience, and status as an expert witness"). Lovett answered that intoxication and speed caused Montague's death and did not attempt to give a medical opinion on her precise cause of death such as that offered by the medical examiner.

Appellant understandably limits his appellate complaint to Lovett's qualifications because Appellant objected at trial that Lovett was not qualified to express the opinions at issue. *See Lovill*, 319 S.W.3d at 691–92 ("A complaint will not be preserved if the legal basis of the complaint raised on appeal varies from the complaint made at trial."). However, each of the questions was a proper topic for expert testimony, and Appellant stipulated at trial to Lovett's qualifications as an expert witness. Appellant's conclusory discussion of his first four points does not establish why Appellant should be permitted to complain on appeal about Lovett's qualifications in light of Appellant's trial stipulation that Lovett was a qualified expert witness and Lovett's testimony, set forth above, concerning his qualifications as an accident reconstructionist and police officer with experience investigating DWI and intoxication manslaughter cases. *See Kastick v. State*, No. 04-98-00556-CR, 1999 WL 734811, at *4–5 (Tex. App.—San Antonio Sept. 22, 1999, no pet.) (not designated for publication) (overruling challenge to expert qualifications because Kastick, despite initially objecting, stipulated at trial to expert's qualifications); *see also Taylor v. State*, No. 03-03-00624-CR, 2006 WL 1649037, at *6–7 (Tex. App.—Austin June 16, 2006, pet.

19

ref'd) (mem. op., not designated for publication) (noting that appellant's trial counsel said "okay" at motion to suppress hearing when trial court accepted witness as expert based on qualifications established in prior motion to suppress hearing and stating that "[a]ppellant is not in a position to complain on appeal about the absence of sufficient evidence concerning the qualifications of the officers as witness"); *Vasquez*, 2006 WL 133462, at *3 (holding expert could testify to opinion on cause of injuries based on knowledge and experience and noting that Vasquez had stipulated to expert's qualifications); *Solis v. State*, No. 14-87-00773-CR, 1990 WL 93230, at *2 (Tex. App.—Houston [14th Dist.] July 5, 1990, pet. ref'd) (not designated for publication) (noting that Solis stipulated to experts' qualifications and overruling challenge to evidence sufficiency because experts testified that substance was marijuana). We cannot therefore say that Appellant has shown that the trial court abused its discretion by permitting Lovett to express the opinions at issue in his first four issues.

Even if there were any error in admitting Lovett's opinions, such nonconstitutional error was harmless. *See Taylor v. State*, 268 S.W.3d 571, 592 (Tex. Crim. App. 2008) (error in admitting evidence is nonconstitutional error and reviewed under rule of appellate procedure 44.2(b)). Under rule of appellate procedure 44.2(b), we must disregard nonconstitutional error that does not affect a defendant's "substantial rights," that is, if upon examining the record as a whole, there is a fair assurance that the error did not have a substantial and injurious effect or influence in determining the jury's verdict. Tex. R. App. P.

20

44.2(b); *Coble v. State*, 330 S.W.3d 253, 280 (Tex. Crim. App. 2010), *cert. denied*, 131 S. Ct. 3030 (2011). If the improperly admitted evidence did not influence the jury or had but a slight effect upon its deliberations, such nonconstitutional error is harmless. *Id.* In making this harm determination we examine the entire record and calculate the probable impact of the error upon the rest of the evidence. *Id.*

Appellant was found guilty of intoxication manslaughter, which required the jury to find that Appellant operated a motor vehicle in a public place, while intoxicated, and by reason of that intoxication caused the death of another by accident or mistake. *See* Tex. Penal Code Ann. § 49.08 (West 2011); *Strickland v. State*, 193 S.W.3d 662, 665 (Tex. App.—Fort Worth 2006, pet. ref'd). The State introduced evidence that in the hours leading up to the fatal accident, Appellant had been drinking beer and whiskey and smoking marijuana. As to the accident, the State introduced evidence that at the time Appellant's car left the roadway in the S-curve of Briar Road, it was traveling about seventy-five miles per hour, which was two and one-half times the posted speed limit. Appellant's car struck a utility pole on the passenger side of the car at a speed of sixty-nine miles per hour, killing Montague instantly. Appellant never applied the brakes. Upon his arrival at the hospital, Appellant's blood-alcohol concentration was .20, two and one-half times the legal limit of intoxication.

Additionally, the jury heard other evidence by which it could reach the same conclusions as Lovett's opinions at issue. Susan Howe, the crime lab

director for the medical examiner's office, discussed the effects of alcohol and marijuana consumption on a person's body and behavior and testified that significant speeding, failing to negotiate a turn, and decreased reaction time to an upcoming turn or to a demand for navigation are consistent with a high level of intoxication. Appellant's own expert, Gary Wimbish, testified without objection on cross-examination by the State that alcohol can affect a person's abilities to perform complex tasks. Wimbish agreed that at Appellant's blood-alcohol concentration as of his arrival at the hospital, the tasks associated with driving a vehicle safely would be very difficult to perform. Ample evidence supported the jury's guilty verdict. Indeed, Appellant does not challenge the sufficiency of the evidence establishing his guilt. *See Motilla v. State*, 78 S.W.3d 352, 356 (Tex. Crim. App. 2002) (recognizing that overwhelming evidence can be a factor to be considered in conducting a rule 44.2(b) harm analysis).

After examining the record as a whole and in light of all the evidence, we have a fair assurance that the alleged error—permitting Lovett to give opinions concerning whether Appellant consciously disregarded a substantial and unjustifiable risk, whether Appellant's intoxication caused Montague's death, whether Appellant's operation of his vehicle was a gross deviation from a normal standard of care, and whether Appellant used his vehicle as a deadly weapon— did not influence the jury, but had at most only a slight effect. *See* Tex. R. App. P. 44.2(b). Because we conclude that Appellant has not established that the trial court abused its discretion by admitting the expert witness testimony at issue and

22

that, in any event, any alleged error was harmless, we overrule Appellant's first four issues.

## V. Conclusion

Having overruled Appellant's five issues, we affirm the trial court's judgment.

ANNE GARDNER
JUSTICE

PANEL:  DAUPHINOT, GARDNER, and WALKER, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED:  April 25, 2013